# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHAEL I. FRANKS,                        )
                                          )
                Plaintiff,                )
                                          )
        v.                                )       Civil Action No. 15-381-CJB
                                          )
NANCY A. BERRYHILL,                       )
Acting Commissioner of Social Security,   )
                                          )
                Defendant.                )

---

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, Wilmington, Delaware, Attorney for Plaintiff.

David C. Weiss, Acting United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware; Patricia A. Stewart, Special Assistant United States Attorney and Nora Koch, Acting Regional Chief Counsel, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

---

## MEMORANDUM OPINION

June 23, 2017
Wilmington, Delaware

*[signature: Christopher J. Burke]*

**BURKE, U.S. Magistrate Judge**

Plaintiff Michael I. Franks ("Franks" or "Plaintiff") appeals from the decision of

Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("Commissioner" or

"Defendant"), denying his claim for Supplemental Security Income ("SSI") under Title XVI of

the Social Security Act, 42 U.S.C. §§ 401-33.[1] The Court has jurisdiction over the matter

pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are motions for summary judgment filed by Franks

and the Commissioner. (D.I. 13, 20) For the reasons set forth below, the Court recommends that

Franks' motion for summary judgment be GRANTED, that the Commissioner's cross-motion for

summary judgment be DENIED, and that the Commissioner is DIRECTED to award benefits to

Plaintiff.

## I.  BACKGROUND

### A.  Procedural History

Franks filed an application for Title II and Title XVI Social Security benefits on March

30, 2009, alleging disability beginning on January 1, 2007. (D.I. 19 (hereinafter "Tr.") at 36,

139-44)[2] Following a hearing before an Administrative Law Judge ("ALJ"), on March 21, 2011,

---

[1]    Nancy A. Berryhill became the Acting Commissioner of Social Security after this case was filed. (*See* D.I. 24 at 1 n.1) Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Berryhill replaced the previous Commissioner, Carolyn W. Colvin, as the Defendant in this case. *See, e.g., Malcolm v. Colvin*, 971 F. Supp. 2d 446, 448 n.1 (D. Del. 2013).

[2]    The transcript in this case in lengthy and is divided among a main entry and ten attachments on the docket. (*See* D.I. 19 & atts. 1-10) The transcript is continuously paginated,

he was awarded a closed period of disability benefits under Title XVI for the period from March 30, 2009 through February 28, 2011. (*Id.* at 36-46) The ALJ found that Franks' disability ended on March 1, 2011. (*Id.* at 46) Franks did not appeal this decision.

Franks then filed a second application for SSI on April 30, 2011, alleging disability beginning on that date. (*Id.* at 20, 148-68) His application was denied initially on October 10, 2011, and was again denied on reconsideration on May 1, 2012. (*Id.* at 49, 93-97, 860-64) On July 24, 2012, Franks next filed a request for a hearing. (*Id.* at 98) The hearing took place on November 13, 2013 before a different ALJ (referred to hereafter as "the ALJ"). (*Id.* at 910) Franks was represented by counsel at the hearing, which was held via video teleconferencing. (*Id.* at 910-50)

On January 31, 2014, the ALJ issued a decision (the "ALJ's decision") denying Franks' claim for SSI. (*Id.* at 20-29) On February 21, 2014, Franks requested review of the ALJ's decision by the Appeals Council. (*Id.* at 14) The Appeals Council denied Franks' request for review on April 17, 2015. (*Id.* at 7-10) Thus, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On May 12, 2015, Franks filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 2) On February 8, 2016, Franks filed his motion for summary judgment. (D.I. 13) The Commissioner opposed Franks' motion and filed a cross-motion for summary judgment on March 9, 2016. (D.I. 20)

---

however, and so the Court will simply refer to it as "Tr.," regardless of whether the citation in question is to D.I. 19 or to one of the attachments.

On January 6, 2017, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case dispositive motions. (D.I. 23) And on January 27, 2017, the parties filed a joint notice of consent to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 25)

## B. Factual Background

Plaintiff Franks was 42 years old at the time of the alleged onset of his disability in April 2011, and 45 years old at the time of the ALJ's decision. (*See, e.g.*, Tr. at 50) He lives with his friend, her two sons, and a dog. (*Id.* at 926, 937) He also has a daughter and a son. (*Id.* at 933-34) He has a 9th grade education, and has past work experience as, *inter alia*, a mover, a cook, and a custodian. (*Id.* at 169, 186)

### 1. Plaintiff's Medical History, Treatment, and Condition

Franks alleges that he has been disabled and unable to work since April 30, 2011 due largely to back problems. (*Id.* at 92-93) The ALJ found that Franks suffers from degenerative disc disease, chronic pain syndrome, and radicular syndrome. (*Id.* at 22) Franks is also obese, standing at approximately 69 inches tall, with his weight ranging from 190 and 257 pounds between March 2011 and November 2013. (*Id.*, *see also id.* at 775, 924)

#### a. Medical evidence prior to Franks' alleged onset date

Franks has experienced problems with his back since at least August 8, 2008, when he slipped and fell in a store, causing pain in his right hip, foot, and lower back. (*Id.* at 249, 266) Beginning in August 2008, he treated with Dr. James Fusco of Baynard Chiropractic Association for his pain. (*Id.* at 264-80, 339-47) Dr. Fusco's assessment was "myofascitis[,] hip

3

strain/sprain[] and/or thigh[,] and lumbar spine strain/sprain[.]" (*See, e.g., id.* at 266) Franks also started receiving treatment from Dr. Peter Bandera, a rehabilitation specialist, beginning in August 2008. (*Id.* at 324-38) Dr. Bandera's initial examination identified spasm and muscle guarding in the low back, a limited range of motion, and "prepatellar tenderness with trace effusion" in the right knee; his impression also was that Franks had lumbar syndrome with "strain/sprain/radiculopathy." (*Id.* at 337) At the end of this period, Dr. Bandera noted that Franks was "trying to get a neurosurgery appointment[,]" noting "bilateral radiation of the low back pain." (*Id.* at 324) He stated that Franks had "antalgic gait" and "tightness in the low back with pain on facet loading." (*Id.*)

In October 2009, Mr. Franks began neurosurgical consultation with Dr. Bikash Bose, complaining of "severe lower back pain and pain radiating down his right leg[.]" (*Id.* at 372) At the initial consultation, Dr. Bose advised Franks "to get an MRI of the lumbar spine, standing lumbar spine x-rays with flexion/extension views, and a bone scan with SPECT imaging of the lumbar spine." (*Id.* at 373) A November 2009 MRI of Franks' lumbar spine demonstrated, *inter alia*, "progressive mild degenerative disc disease" and "[b]road based disc protrusion with bilateral mild neuroforamen narrowing [narrowing of the nerve passageways that branch off the vertebrae] and bilateral facet arthritis" at the L5-S1, L4-5, and L3-4 disc levels. (*Id.* at 377-78) A bone scan taken on November 17, 2009 showed a likelihood of a "marked degree of facet arthrosis [or deterioration of joint cartilage]." (*Id.* at 379) On November 30, 2009, Dr. Bose recommended surgery based on his evaluation of the diagnostic evidence, noting that Franks could not "walk more than 1/4 -1/2 mile maximum" or "sit for more than 1/2-hour at a time[,]" and "ha[d] to keep changing positions because of the pain." (*Id.* at 371) Thereafter, in January

4

2010, Franks underwent lumbar fusion and decompression surgery with Dr. Bose for "[l]umbar radiculopathy secondary to lumbar disk disease[.]" (*Id.* at 355-61)

After the surgery, Franks continued his treatment with Dr. Bose and Dr. Bandera. (*Id.* at 367-81, 399-403, 407-14, 429-35) As of December 2, 2010, Franks was still experiencing pain at the lower end of the surgical incision, and Dr. Bose "gave him a refill of the Percocet and a prescription for physical therapy." (*Id.* at 407) Dr. Bandera noted muscle spasms and guarding on December 8, 2010. (*Id.* at 429)

In a medical statement dated January 18, 2011, Dr. Bose identified the following symptoms that Franks was experiencing on examination: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) positive straight leg raising test; (4) the need to change position more than once every two hours; and (5) chronic nonradicular pain and weakness. (*Id.* at 428, 464) He indicated that Franks could stand for 15 minutes at a time, sit for 60 minutes at a time, work four to six hours per day (the precise number of hours was "unknown because of pain"), lift ten pounds on an occasional basis, not lift any weight on a frequent basis, and never bend or stoop. (*Id.*) Dr. Bose concluded that Franks "will not be able to keep a 40 [hour] job on a consistent basis or he will have flare ups [and] miss work probably quite consistently." (*Id.*)

On February 11, 2011, Dr. Bose noted that Franks was "still complaining of lower back stiffness and pain" that moved from the left to the right side of his back. (*Id.* at 463) Dr. Bose recommended an MRI, CT scan, and bone scan to evaluate further. (*Id.*) An MRI taken on February 23, 2011 revealed a "[s]mall disc protrusion" at the L3-4 level. (*Id.* at 466) As of March 14, 2011, Franks still had lower back pain and "his knees ha[d] given out a couple of

5

times." (*Id.* at 465) Based on these symptoms and the findings of the MRI, Dr. Bose

recommended epidural injections. (*Id.*)

On March 17, 2011, during an initial visit with Dr. Domingo C. Singson, Franks was

diagnosed with chronic back pain, chronic obstructive pulmonary disease, chronic anxiety,

depression, and obesity. (*Id.* at 815)

### b. Medical evidence subsequent to Franks' alleged onset date[3]

### (1) 2011

On May 11, 2011 and June 8, 2011, Franks received lumbar epidural injections with Dr.

Pramod Yadhati, a pain management specialist. (*Id.* at 494, 496) On June 30, 2011, he again

saw Dr. Bose, complaining of inability to sleep and persistent pain. (*Id.* at 470) Dr. Bose noted

that Franks hadn't responded to the epidural injections, and recommended a provocative

discography "to see if [the] L3-4 [level was] the pain generator[,]" and referred Franks back to

Dr. Yadhati. (*Id.*) Franks was discharged from Dr. Yadhati's office as of August 2, 2011,

however, due to multiple missed appointments, non-compliance with medical management, and

improper use of prescribed medication. (*Id.* at 492)

On July 6, 2011, Franks submitted a Function Report to the Social Security

Administration, in which he indicated, *inter alia*, that: (1) he slept poorly because of his back

pain; (2) he needed assistance with daily activities such as dressing, getting out of the bathtub,

---

[3]     Dr. Singson, whose records are not summarized below, also saw Franks on a
monthly basis between May 2011 and April 2013. He frequently noted on examination that
Franks had lumbar pain, spasms, positive straight leg test (that is, that Franks experienced pain
when his leg was raised to a certain degree), and/or reduced range of motion, though those
reported symptoms appeared to fluctuate in severity as time went on. (Tr. at 726, 730, 734, 738,
741, 746, 749, 753, 758, 763, 767, 771, 775, 778, 782, 786, 789, 792, 795, 798, 801, 804, 807,
810)

and shaving; (3) he could not stand long enough to prepare his own meals; (4) his back pain prevented him from performing household chores; and (5) he could only walk half a block before needing to rest and could lift no more than five pounds. (*Id.* at 200-07)

On August 15, 2011, Franks visited the Christiana Care Health Services emergency room complaining of back pain after a fall when he ran out of Percocet. (*Id.* at 541) During the emergency room visit, an x-ray of the lumbar spine revealed, *inter alia*, increased narrowing of the L3-4 interspace since 2008. (*Id.* at 549)

From August 2011 through November 2011, Franks participated in physical therapy at Dynamic Physical Therapy. (*Id.* at 551-66, 574-98) During that time, Franks reported both some progress and some setbacks regarding his condition. For example, in some visits in September 2011, Franks reported "tightness comes and goes, but is greatly relieved with aquatic [therapy,]" (*id.* at 591-97), or that he was having a "good day today[,]" (*id.* at 553). But on October 4, 2011, he "wishe[d] to defer exercises . . . because of pain levels [being at an 8 on a scale of 10,]" (*id.* at 584). At his final visit on November 14, 2011, Franks' therapist reported the objective findings that Franks "ha[d] difficulty falling asleep, ha[d] difficulty finding a comfortable position and [was] awakened by pain." (*Id.* at 574)

On October 6, 2011, Dr. M.H. Borek, a state agency physician, completed a Physical Residual Functional Capacity ("RFC") Assessment based on a review of Franks' medical evidence of record. Dr. Borek opined that Franks could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; and had no limits on his ability to push and/or pull. (*Id.* at 568) Dr. Borek

concluded that Franks could perform work that never required him to climb ladders, ropes, or scaffolds, but occasionally required him to climb ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (*Id.* at 570) Dr. Borek further concluded that Franks' "alleged inability to perform even sed[entary] physical activity [was] partially credible," especially given the impact of obesity, but not fully credible "given that current exams do not reveal sig[nificant] motor loss [and Franks] can amb[ulate without an] assist[ive] device[.]" (*Id.* at 573) Dr. Borek noted that Franks' maximum RFC was for sedentary work. (*Id.*)[4]

On October 19, 2011, Franks saw Dr. Chukwuma Obi Onyewu, a pain specialist, for an initial consultation. (*Id.* at 619-23, 646-51) At that consultation, Franks reported back pain, weakness, myofascial pain, spasms, stiffness, leg pain, and joint pain. (*Id.* at 620) An EMG showed electrodiagnostic abnormalities consistent with bilateral S1 radicuopathy, but a bone scan showed no abnormal uptake activity in the lumber spine region. (*Id.* at 621) Dr. Onyewu ordered a discogram (including a CT scan), which was conducted on November 23, 2011, to further evaluate Franks' pain. (*Id.* at 616, 642-43) The discogram revealed a posterior grade 4 annular tear (a form of spinal degeneration) at L3-4, a grade 2 annular tear at L4-5 and a grade 1 annular tear at L2-3, as well as concordant 10/10 low back pain. (*Id.* at 605, 616) On December 28, 2011, Dr. Onyewu prescribed a back brace, an epidural steroid injection, and Percocet, Neurontin, and MS Contin for Franks' pain. (*Id.* at 605)

### (2)    2012

On January 10, 2012, Dr. Onyewu performed a lumbar disc posterior annular ablation.

---

[4]      This opinion was later affirmed on April 30, 2012 by Dr. Robert Palandjian, a state agency physician. (Tr. at 50)

(*Id.* at 624-25, 652-55) Franks subsequently stopped treating with Dr. Onyewu, however, because of "the extremely long waiting time and lack of personalized attention[.]" (*Id.* at 834)

Beginning on February 2, 2012, Dr. Bruce Grossinger, a neurologist, began treating Franks. (*Id.*) In a letter written by Dr. Grossinger in February 2012, he noted that Franks had muscle weakness, diminished sensation in the legs and thighs, tenderness overlying the lumbar facets, that Franks had difficulty sitting and standing and had to lie down for minutes or hours. (*Id.* at 834-35) Dr. Grossinger noted that Dr. Singson had concluded that Franks was "unable to work[.]" (*Id.* at 834) And ultimately Dr. Grossinger himself found that Franks had "failed surgical low back syndrome[,]" an "internal disc disruption at L3-4[,]" and, as a result, Franks was "totally and permanently disabled from gainful employment" as he "cannot reasonably work even part time sedentary jobs." (*Id.* at 835)

On March 8, 2012, Dr. Grossinger performed an electromyogram ("EMG") and nerve conduction study ("NCS") on Franks, which indicated "moderate right S1 radiculopathy" but no acute or chronic denervation. (*Id.* at 673-74) On three occasions from May to July 2012, Dr. Grossinger gave Franks lumbar epidural steroid injections. (*Id.* at 825-33)

On May 27, 2012, Franks received emergency care at St. Francis Hospital for pain in his back, which had been exacerbated while doing laundry. (*Id.* at 850) He indicated that the pain was similar to his prior chronic back pain, and was prescribed medication, including Percocet. (*Id.*; *see also id.* at 854)

### (3)    2013

On March 26, 2013, Franks reported that his back pain "can be a 10 out of 10 in nature." (*Id.* at 667) On that date, Dr. Grossinger gave Franks a lumbar spinal trigger point injection and

9

renewed Franks' pain medications. (*Id.* at 667-68) On April 23, 2013, Dr. Grossinger performed the same procedure again. (*Id.* at 823-24) That same day, Dr. Grossinger noted that Franks had "gotten a letter from Dr. Singson stating that the Grossinger Neuropain Specialists will be the only doctors prescribing pain medicines for Mr. Franks[.]" (*Id.* at 823)[5]

At a follow-up appointment on August 20, 2013, Dr. Grossinger noted that Franks "continue[d] to have severe complaints of pain and tenderness in the lumbar spine" and "pain and tenderness along the coccyx [or tailbone] area[,]" and that he walked with an antalgic gait. (*Id.* at 820) Dr. Grossinger concluded that Franks suffered "from lumbar radiculopathy, lumbar facet syndrome, coccydynia and chronic pain syndrome[,]" and proceeded to give Franks a musculoskeletal caudal epidural injection for the pain. (*Id.*)

On September 24, 2013, during another follow-up appointment, Dr. Grossinger noted that Franks "use[d] a back brace and ambulate[d] with great difficulty secondary to pain[,]" and that Franks had "a severely antalgic gait" and "pain and tenderness in the lumbar spine with pain radiating down the legs bilaterally." (*Id.* at 818) Dr. Grossinger concluded that Franks suffered from "[c]luneal nerve root neuritis; lumbar radiculopathy; lumbar facet syndrome; and chronic pain syndrome." (*Id.*) On that date, Franks underwent "non-narcotic interventional pain management in the form of ultrasound guided cluneal nerve blocks." (*Id.*)

On October 22, 2013, Dr. Grossinger completed a Lumber Spine Medical Source Statement; the conclusions therein, according to Dr. Grossinger, were supported by an EMG, MRI and clinical findings on exam. (*Id.* at 669-72) He indicated the following objective signs of

---

[5]      After April 8, 2013, Dr. Singson had terminated Franks from his practice because Franks had "[l]ied and tried to get more Percocet in [the emergency room]." (Tr. at 726)

Franks' injury: (1) reduced range of motion; (2) positive seated straight leg raising test; (3) abnormal gait (4) reflex loss; (5) tenderness; (6) swelling; (7) muscle spasm; (8) muscle weakness; and (9) impaired sleep. (*Id.* at 670) Dr. Grossinger concluded that Franks could sit or stand/walk for less than two hours in an eight-hour work day, and that he would need five-minute periods of walking around every five minutes of an eight-hour work day. (*Id.* at 670-71) He also indicated that Franks could never lift more than ten pounds, nor twist, stoop, crouch/squat, climb ladders, or climb stairs. (*Id.* at 671) Further, Dr. Grossinger opined that Franks was likely to be "off task" for 15 percent of a typical work day, that Franks' impairments were likely to produce "good days" and "bad days" and that Franks would likely be absent from work more than four days per month. (*Id.* at 672) Dr. Grossinger ended by finding that, due to his pain, Franks was incapable of even "low stress" work. (*Id.*)

Dr. Grossinger expanded on his opinions in an Office Note following an appointment with Franks in late October 2013. (*Id.* at 816-17) He there concluded that Franks had "a host of neurological conditions including, but not limited to, osteoarthritis, lumbar radiculopathy, lumbar facet syndrome and chronic pain syndrome, with EMG-proven right S1 radiculopathy." (*Id.* at 816) He noted that Franks continued to have "low back pain with sciatica into both legs, right greater than left." (*Id.*) Franks' condition, according to Dr. Grossinger, caused "difficulty sitting and standing." (*Id.*) Dr. Grossinger stated that "[o]n a bad day, [Franks] will lie recumbent or in a supine position . . . [and] [i]f he goes grocery shopping he will have to use multiple small bags." (*Id.*) Dr. Grossinger repeated his opinion that Franks "could not reasonably labor in any capacity, even [in] a part-time sedentary position, purely on the basis of his physical medical conditions." (*Id.* at 817)

## 2. The Administrative Hearing

At the administrative hearing on November 13, 2013, the ALJ heard the testimony of Franks and Christina Beatty-Cody ("Beatty-Cody"), an impartial Vocational Expert ("VE"). (Tr. at 910-50)

### a. Plaintiff's Testimony

At the hearing, Franks sat leaning to the side, and the ALJ told him to "feel free to stand and sit" as he needed to. (*Id.* at 936, 938) At one point, Franks did stand up for a minute. (*Id.* at 942)

Upon questioning by the ALJ, Franks explained that his back-related health problems began due to the 2008 "slip and fall" that "made [his] back even worse." (*Id.* at 930) Franks testified that he had stopped working in the late 2000s, and had certainly not worked at all since March 3, 2011. (*Id.* at 923, 925, 928) He also testified that he had tried to find work more recently since his fall, but his leg "shut[] down" on him, and he could not work because he was in so much pain in his leg and back. (*Id.* at 923-24)

When questioned by the ALJ about his major health problems, Franks explained that it was his back that had initially caused him to stop working, and that his legs had also gone numb. (*Id.* at 928) He testified that he "couldn't move" until going to Christiana Hospital and meeting with Dr. Bose, and that he had been disabled since undergoing "fusion" surgery for his lower back pain in 2010. (*Id.* at 928-29)[6]

The ALJ next questioned Franks about "the totality of what it is that" had been keeping

---

[6]    Franks' attorney clarified that the surgery was a fusion at the L5/S1 level (the 2010 surgery discussed in Section I.B.1.a above). (Tr. at 929)

him from being able to work since his injury. (*Id.* at 931) Franks testified that his back bothered him and that he had "strong pains" in his legs. (*Id.*) He testified that he had trained and was used to "lifting and doing heavy work" of which he was no longer capable. (*Id.*)

In terms of his daily activities, Franks testified that he could not drive; in order to ride in a car, he had to lean his seat "fully back where it's comfortable" for him. (*Id.* at 932)[7] He stated that his friend drove him to all of his doctor's appointments, or anywhere else he had to go. (*Id.*) When the ALJ asked him whether he could take the bus, Franks testified that he could, but "it's just not happening because [his] legs get numb, and they start hurting, and [his] back starts hurting real bad." (*Id.*) Franks also testified that he lives in a house with stairs, and can do light cooking and dusting, but has to "lay down when [his] back and [] legs bother[] [him]." (*Id.* at 933) He added that his daughter and son come to visit him, and when they do, he lays on the couch or is in his room. (*Id.* at 933-34) Franks testified that his daughter and son help him as much as possible, "but other than that, there is nothing" when they leave at the end of the day. (*Id.*) Franks stated that he goes to church every other week, and infrequently goes grocery shopping. (*Id.* at 934, 939)

With regard to medication, Franks confirmed that as of November 7, 2013, he took cyclobenzaprine, trazodone, lorazepam, Percocet, albuterol, Xanax, and gabapentin, all of which were prescribed by Dr. Grossinger. (*Id.* at 934-35) He testified that he did not suffer from any significant side effects of his medication. (*Id.* at 935) Franks further testified that Dr. Grossinger gives him shots and advises him to "just lay down and get plenty of rest," to stay off of his legs

---

[7]     Beyond his pain, Franks testified that another reason why he could not drive was that his license was suspended due to a speeding ticket. (Tr. at 931-32)

and back, and sometimes to put himself in the fetal position. (*Id.* at 939)

When the ALJ asked for more details about Franks' chronic pain, Franks testified that the pain was in his lower back, and "goes down to [his] right leg, into [his] knee, into [his] ankle, and then it switches over into [his] left, and it stays there." (*Id.* at 936) He testified that the 2010 fusion surgery performed by Dr. Bose did not provide any relief. (*Id.*) Questioned by his attorney regarding the frequency of his leg pain, Franks testified that "pain comes a lot of times, often. It stays there[,]" although sometimes it "eases up." (*Id.* at 937) He explained that his back bothers him constantly, specifying that he felt back pain "whenever the pain hits or it's cold outside" or when he "tr[ies] to do something." (*Id.* at 938) Franks further testified that he could only walk one block before having to stop, rest, or sit down, and that he could not stand for more than 10-15 minutes due to the pain in his legs. (*Id.*) He stated that he could sit for about 10 to 30 minutes. (*Id.*) He also testified that his pain could be distracting. (*Id.* at 939)

Franks explained that he did not feel he could work a full-time job at this point, because his back and right leg would not allow him to do so. (*Id.* at 939-40) He cited poor sleep and the fact that he has good and bad days, with "maybe" three good days in a week. (*Id.* at 940)

### b.     The Vocational Expert's Testimony

VE Beatty-Cody also testified during the hearing. She explained that she was aware that Franks had engaged in prior work as a fast food cook, and as a furniture mover. (*Id.* at 925-26) She stated that Franks' work as a fast food cook was medium in exertion and would be Skilled Vocational Preparation ("SVP") Level 5. (*Id.* at 925) She also stated that Franks' work as a furniture mover would be at a very heavy exertional level, with an SVP of 3. (*Id.* at 926)

The ALJ asked Beatty-Cody four hypothetical questions. The ALJ posed the first

14

hypothetical question as follows:

> This is a gentleman who is currently 45, not 44. He is 45 years old today. He was about 43 at the amended onset date, and about 45 at this time . . . has a limited education. He completed the ninth grade, but did not complete high school. He is able to read, write, and use numbers, and has the past work history that you've described, with the following restrictions. In hypothetical one, Ms. Beatty-Cody, the individual is able to lift and carry as much as 20 pounds occasionally, 10 pounds frequently. He can stand and walk in excess of three hours in a given hour, but less than six. I would say less than five. As much as five, more than three, but as much as five, but no more. He can sit as much as six hours. I would note that a sit-stand option would be very useful. [Disability Determination Services (or "DDS")] did not note that, but I'm going to add a sit-stand option in hypothetical one. He can only occasionally push-pull—excuse me, only occasionally stoop, crouch, crawl, squat, kneel, balance, or climb stairs. And I'm saying that aware of a knee brace and complaints of arthritis. His work should not involve ladders or scaffolds, dangerous heights, or dangerous machinery. He should not have—his work should not involve concentrated exposure to cold, dust, fumes, gases, because of asthma, or vibrations, no concentrated exposures. Because of prior work history and some mild depression, I'm limiting him to—unlike DDS, I'm limiting—I'm noting moderate limits in concentration and persistence, and I'm going to express those differently. I'm going to express those as follows functionally. He can understand, remember, and carry out simple instructions just fine. He retains the capacity to concentrate and pay attention at that level of complexity, despite medications and pain. Pain can be a psychological factor, a good reason to limit to simple, unskilled work. He retains the capacity to perform within a schedule, be on time, produce an adequate amount of work and limit breaks to times permitted. I would also—DDS didn't do it, but I would limit to only occasional contact with the general public at most, just in case people got to be kind of annoying. Would there be jobs in significant numbers with those limitations, Ms. Beatty-Cody?

(*Id.* at 943-44) Beatty-Cody answered yes. (*Id.* at 944) She specified three positions that the hypothetical person could perform at the light level of exertion: (1) an assembler, with an SVP of 2; (2) an inspector, with an SVP of 2; and (3) a hand bander, with an SVP of 1. (*Id.* at 944-45)

The ALJ next posed a second hypothetical question, which was the "[s]ame as hypothetical one, excepted limited to standing and walking no more than two hours with a sit-stand option. I would say two to three hours with a sit-stand option." (*Id.* at 945) Beatty-Cody testified that all three positions that she described in response to the first hypothetical question would "survive" (i.e., be available options for the hypothetical person). (*Id.*)

The ALJ then asked a third hypothetical question, which incorporated all the same limitations as the first two questions, "except sedentary work, lifting and carrying no more than 10 pounds and standing and walking really no more than two hours in a given work day with the sit-stand option. Would there be jobs?" (*Id.* at 945-46) Beatty-Cody again answered yes. She testified that at the sedentary exertional level, the hypothetical person could work as: (1) a type copy examiner, with an SVP of 2; (2) a table worker, with an SVP of 2; and (3) a bench hand, with an SVP of 2. (*Id.* at 946)

Finally, the ALJ asked Beatty-Cody the fourth hypothetical question:

> If because of something known as chronic pain syndrome, radiculopathy of pain from lower back to the legs, difficulty ambulating, the need to wear [a] knee brace, continued back pain problems with the musculoskeletal system from a remote slip-and-fall date—we've heard mention of asthma—pain in the right knee, difficulty getting around, not going too many places, letting a driver's license expire and stay unused could suggest that there is a problem sitting in one place for any extended period of time, sitting upright for any period of time, any additional interaction of drugs, some of which are potent, opioids and the like, some—although not seeing a psychiatrist, taking some rather strong psychotropic medication such as Xanax on a regular basis could have a dulling effect on somebody's concentration and disposition over a period of time, and that with pain.
>
> In your considered opinion, would you find it likely the hypothetical individual would be able to sustain work if these—if these problems

16

reached the level of marked limits, and if I assigned full credibility
to the testimony that has been presented here this morning, as well
as matters in addition—and additional matters you may have
noticed in preparing the file, matters that have been pointed out by
the representative, the claimant, or me?

(*Id.* at 946-47) Beatty-Cody responded no; opining that "the factors [the ALJ] mentioned would

be work preclusive." (*Id.* at 947) Beatty-Cody further testified that the person described in the

fourth hypothetical question would cause a reduction in productivity of 15 to 20 percent or more,

and would also cause excessive absences, and if the absences were to be on a regular basis (e.g.,

one day a month or more), then they also would be work preclusive. (*Id.*) After a clarifying

question from the ALJ, Beatty-Cody confirmed that the factors described in the fourth

hypothetical question, along with an assignment of full credibility to the statements made during

the hearing, would exclude the hypothetical individual from the work force. (*Id.*)

Franks' attorney then followed up with a question pertaining to the last hypothetical,

asking Beatty-Cody how it would affect the hypothetical individual's ability to sustain work if he

also required additional breaks beyond the already-scheduled breaks. (*Id.* at 948) Beatty-Cody

responded that any additional breaks that occurred on a regular basis would be considered

excessive by the employer, which would be work preclusive in and of itself. (*Id.*) She testified

that such breaks would also reduce productivity, and if it reduced productivity by 15 to 20

percent or more, that would also be work preclusive. (*Id.*)

### 3.    The ALJ's Findings

On January 31, 2014, the ALJ issued the following 10 findings:

1.    The claimant has not engaged in substantial gainful activity
      since April 30, 2011, the application date (20 CFR 416.971
      *et seq.*).

17

2.   The claimant has the following severe impairments: degenerative disc disease; chronic pain syndrome; radicular syndrome; and obesity (20 CFR 416.920(c)). . . .

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). . . .

4.   After careful consideration of the entire record, [the ALJ found] that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) with the ability to stand and walk in excess of 3 hours but no more than 5 hours in a given workday. He can sit as much as 6 hours; he needs a sit stand option. The claimant can occasionally stoop, crouch, crawl, squat, kneel, balance or climb stairs, but his work should not involve ladders, scaffolds, dangerous heights or dangerous machinery; nor should he work in concentrated exposure to cold, dust, fumes, gases, or vibrations. He can understand, remember and carry out simple instructions. His work should require no more than occasional contact with the public. . . .

5.   The claimant has no past relevant work. (20 CFR 416.965). . .

6.   The claimant was born on July 5, 1968 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)). . . .

10.     The claimant has not been under a disability, as defined in
        the Social Security Act, since April 30, 2011, the date the
        application was filed (20 CFR 416.920(g)).

(Tr. at 22-29 (emphasis omitted))

## II.     STANDARD OF REVIEW

### A.     Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. In determining the appropriateness of summary judgment, the Court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but

not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411

F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but

more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005) (citation omitted). In analyzing whether substantial evidence supports the Commissioner's

findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may

19

not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*; *Hipkins v. Barnhart*, 305 F. Supp. 2d 394, 398 (D. Del. 2004).

## III.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R § 416.920; *see also Russo v. Astrue*, 421 F. App'x. 184, 188 (3d Cir. 2011). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). When a claimant's impairment meets or equals an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment fails to meet or medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating that a claimant is not disabled if he or she is able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the

21

limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted). "The claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted).

If the claimant is unable to return to his or her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him or her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his or] her medical impairments, age, education, past work experience, and residual functional capacity." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.*

## B. Franks' Arguments on Appeal

On appeal, Franks presents four arguments: (1) the ALJ failed to comply with Social Security Ruling ("SSR") 96-8p by entirely ignoring a treating physician's opinion (the opinion of Dr. Bose) and by failing to provide any reasons for the rejection of that medical opinion; (2) the ALJ failed to acknowledge or discuss evidence that was contrary to her opinions, and her decision was thus not supported by substantial evidence; (3) the ALJ failed to accord adequate weight to the opinion of Franks' treating physician, Dr. Grossinger, and wrongly rejected that

opinion; and (4) it was not established that there is other work in the national economy that Franks could perform. (D.I. 14 at 1-2, 13-25) Franks requests that the Court reverse the Commissioner's decision without remand, and exercise its authority to direct an award. (*Id.* at 25) In the alternative, he requests that the Court remand this case to the Commissioner with instructions to:

> (1) properly consider all of the evidence including the opinions of Mr. Franks's treating physicians and the treatment notes; (2) reassess his residual functional capacity; (3) obtain new vocational testimony and pose a complete question to the VE; and (4) issue a new decision based on substantial evidence and proper legal standards, or alternatively award benefits based upon the evidence.

(*Id.* at 25-26) The Court addresses these arguments in turn.

### 1. The ALJ's Failure to Mention the Opinion and Notes of a Treating Physician, Dr. Bose

Franks first argues that the ALJ erred by entirely ignoring the medical opinion of Dr. Bose. (D.I. 14 at 13-17; D.I. 22 at 2-3) Pursuant to SSR 96-8p, an "RFC assessment must always consider and address medical source opinions," and in cases where the RFC assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). While the ALJ is "not bound to accept physicians' conclusions, [s]he may not reject them unless [s]he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983) (citing *Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981)); *see also Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

In making this argument, Franks points to Dr. Bose's January 2011 medical assessment

regarding Franks' physical limitations. (D.I. 14 at 13 (citing Tr. at 428)) In that assessment, Dr.

Bose concluded that Franks would not be able to perform full-time work. (Tr. at 428) In

contrast, as noted above, the ALJ concluded that Franks had the RFC to perform "light work" as

defined in 20 C.F.R. 416.967(b),[8] and that there were jobs existing in significant numbers in the

national economy that Franks could perform. (*Id.* at 24, 28)

It is true, then, that Dr. Bose's opinion is contrary to the ALJ's RFC finding. The ALJ

found, *inter alia*, that Franks could "stand and walk in excess of 3 hours but no more than 5

hours in a given workday . . . can sit as much as 6 hours . . . [and] can occasionally stoop, crouch,

crawl, squat, kneel, balance or climb stairs[.]" (*Id.* at 24) Dr. Bose's medical assessment, by

contrast, stated that Franks could stand for 15 minutes at a time, sit for 60 minutes at a time,

work for four to six hours in a day, and never bend or stoop. (*Id.* at 428) Dr. Bose's opinion is

also clearly inconsistent with a finding that Franks could perform "light work" as defined in 20

C.F.R. 416.967(b), since he determined that Franks could lift only 10 pounds occasionally and

could lift no weight on a frequent basis. *Compare id.*, *with* 20 C.F.R. 416.967(b) (defining "light

work" as involving "lifting no more than 20 pounds at a time with *frequent* lifting or carrying of

---

[8]     20 C.F.R. 416.967(b) reads:

Light work involves lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of
performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone can do
light work, we determine that he or she can also do sedentary work,
unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

objects weighing up to 10 pounds") (emphasis added).

And it is also true that, as Plaintiff notes, the ALJ never mentioned Dr. Bose's medical assessment in her decision. (*See* Tr. at 20-29) But the Commissioner argues that this was not legal error, for two reasons. First, the Commissioner asserts that "Dr. Bose did not provide any significant treatment to Plaintiff during the time period relevant to his current claim." (D.I. 21 at 7) Second, it argues that the ALJ was not required to address Dr. Bose's opinion because of "the unique circumstances presented here, where the opinion at issue was previously considered and given significant weight, but Plaintiff repudiated that opinion and asserted that his condition improved and he was no longer disabled[.]" (*Id.*)

The first of these two arguments is a winning one for the Commissioner.[9] Dr. Bose made his medical assessment on January 18, 2011. (*Id.* at 428) In the decision regarding Franks' earlier claim for benefits, the ALJ reviewing that matter found that Franks' period of disability ended on March 1, 2011. (*Id.* at 46) But with regard to his current benefits claim, Franks' alleged onset date is April 30, 2011. (*Id.* at 20-29, 148-68) Moreover, as the Commissioner explains, "just one treatment note attributed to Dr. Bose appears in the record after [this] alleged onset date." (D.I. 21 at 7 (citing Tr. at 470)) That note, dated June 30, 2011, does not indicate that Dr. Bose conducted any type of physical exam of Franks, and Dr. Bose ultimately concludes

---

[9]    As to the Commissioner's second argument, it is true that Franks was previously awarded a closed period of benefits by a different ALJ, for the period from March 30, 2009 through February 28, 2011. (Tr. at 36-46) In that decision, the prior ALJ afforded Dr. Bose's opinion "significant weight[.]" (*Id.* at 42) But the Court does not agree with the Commissioner that Franks ever clearly "repudiated" Dr. Bose's opinion. Indeed, at his March 11, 2011 hearing regarding the earlier claim for Title XVI benefits, Franks testified that he remained in significant pain, and experienced stiffness and spasms. (*Id.* at 885-86) At that same hearing, he testified that he could stand for only 15 to 20 minutes at a time, could lift about five pounds, and could only bend, kneel, or stoop "a little bit." (*Id.* at 894-95)

the note by explaining that he is referring Franks to another physician (Dr. Yadhati) for further treatment. (Tr. at 470) Nowhere in the note (or thereafter in the record) does Dr. Bose offer an opinion on Franks' ability to work. (*Id.*)

Thus, since Dr. Bose did not offer a medical opinion during the relevant period of claimed disability, and indeed (in essence) did not treat Franks during that period, the ALJ did not err by failing to consider Dr. Bose's earlier, pre-onset date (January 2011) medical assessment. *Cf. Johnson*, 529 F.3d at 204 (holding that ALJ was entitled to overlook medical testimony that "was neither pertinent, relevant, or probative" in that it addressed a claimant's health as of October 1993, in a case where the claimant was required to establish that she was disabled prior to April 1991); *Wiberg v. Colvin*, Civil Action No. 11-494-LPS-CJB, 2014 WL 4180726, at *23 (D. Del. Aug. 22, 2014) (considering the timing of treating physician's opinion to determine whether it was relevant to the claim at issue). This is especially so where, as here, the ALJ was aware that there had been an earlier adjudication (from a different ALJ) indicating that Franks was not disabled as of March 2011 (a decision that had not been challenged on appeal). It makes sense that, under these circumstances, the ALJ would instead have been focused on those physician opinions regarding Franks' work ability that were generated *during* the relevant period of claimed disability.

### 2. The ALJ's Failure to Acknowledge and Evaluate Other Relevant Medical Evidence

Next, Franks argues that the ALJ ignored evidence contrary to her findings, and that her decision was not supported by substantial evidence. (D.I. 14 at 1, 16-19; D.I. 22 at 4) Here, the "ignored" evidence at issue is the records and findings of Dr. Singson, Dr. Onyewu and Dr.

26

Grossinger, respectively. (*Id.*)

More specifically, Franks complains that the ALJ did not make reference in her decision to Dr. Singson's treatment notes, (*see* Tr. at 17-29), even though Franks was under Dr. Singson's care during much of the relevant period (from March 2011 through April 2013), and despite the fact that Dr. Singson repeatedly recorded that Franks experienced, *inter alia*: (1) lumbar pain; (2) spasms; (3) positive straight leg test; and (4) reduced range of motion, (*see* Tr. at 724-815).[10] The ALJ did discuss Dr. Onyewu's treatment of Franks, (Tr. at 25-26), but Franks faults the ALJ for selectively referencing Dr. Onyewu's medical notes. (D.I. 14 at 18 ("The ALJ noted a portion of Dr. Onyewu's medical notations, but not all of his findings.")) And lastly, Franks argues that the ALJ erred by excluding reference to certain of Dr. Grossinger's treatment notes, "which contained numerous positive findings on exam." (*Id.* at 16)

"When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason*, 994 F.2d at 1066). "The ALJ must consider all evidence and give some reason for discounting the evidence she rejects." *Id.* (citing *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983)). However, the ALJ need not "make reference to every relevant treatment note in a case where the claimant, such as [Franks], has voluminous medical records[.]" *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).

In light of the Court's decision set out below in Section III.B.3 (and, relatedly, in Section III.B.4), the Court need not address these claims of error. Franks is certainly correct that the

---

[10]     Dr. Singson's medical records make up 92 pages of the transcript in this case. (Tr. at 724-815)

medical records of Dr. Singson and Dr. Onyewu provide support for the notion that Franks was incapable of substantial gainful employment during the relevant period. (*Cf.* Tr. at 834 (Dr. Grossinger noting that Dr. Singson had, as of February 2012, concluded that Franks was unable to work)) And as to Dr. Onyewu's records, it is also fair to say that there are some instances where the ALJ seemed to highlight wording that would tend to cut against a disability finding (*id.* at 25 (citing Dr. Onyewu's observation of Franks' "smooth and coordinated gait" on October 19, 2011)), while omitting that augering in favor of such a finding, (*id.* at 622 (the October 19, 2011 record, noting that Franks' gait was also "antalgic"). But these issues really seem subordinate to the issue discussed in Section III.B.3: whether the ALJ improperly afforded "little weight" to Dr. Grossinger's medical opinion that Franks was incapable of even "low stress" work in the relevant period. (Tr. at 669-72) And Franks' claims that the ALJ ignored certain of Dr. Grossinger's records are also obviously related to the issues discussed in Section III.B.3. Thus, the Court will decline to address these claims of error further, and will proceed to the question of whether the ALJ improperly assessed Dr. Grossinger's opinion.

3.   **The Weight Afforded to the Opinions and Assessments of Dr. Grossinger**

Franks' next argument—and the key one here—is that the ALJ did not give the medical opinion of Dr. Grossinger the appropriate weight. (D.I. 14 at 19-23; D.I. 22 at 4-6)

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429); *see also*

*Dougherty v. Astrue*, 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli*, 247 F.3d at 43.

These regulations instruct that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also Fargnoli*, 247 F.3d at 43; SSR 96-2P, 1996 WL 374188, at *2 (July 2, 1996). After undertaking this analysis, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion by considering several factors: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the physician presents relevant medical evidence in support of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the degree to which the opinion relates to an area in which the physician specializes, and (6) any other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

When a treating physician's opinion conflicts with that of a non-treating, non-examining

physician, an ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (internal quotation marks and citation omitted). An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales*, 225 F.3d at 317.

Here, Franks asserts that the ALJ should have afforded controlling weight to Dr. Grossinger's opinion that Franks could not reasonably labor in any capacity based on Franks' physical medical condition. (D.I. 14 at 22; D.I. 22 at 5 (citing Tr. at 817)) Dr. Grossinger offered this assessment on multiple occasions, the first of which came in February 2012, (Tr. at 835), and the last of which came on October 23, 2013 (after nearly 21 months of treating Franks), (*see id.* at 817, 834). In coming to this conclusion in the later assessment, Dr. Grossinger relied on findings he recorded in a Lumbar Spine Medical Source Statement, which indicated:

- Franks had certain objective signs of his impairments: (1) reduced range of motion; (2) positive seated straight leg raising test; (3) abnormal gait (4) reflex loss; (5) tenderness; (6) swelling; (7) muscle spasm; (8) muscle weakness; and (9) impaired sleep. (*Id.* at 670)

- Franks could sit or stand/walk for less than two hours in an eight-hour work day, and would need five-minute periods of walking around every five minutes of an eight-hour work day. (*Id.* at 670-71)

- Franks could never lift more than 10 pounds, nor twist, stoop, crouch/squat, climb ladders, or climb stairs. (*Id.* at 671)

- Franks was likely to be "off task" for 15 percent of a typical work day, and that Franks' impairments were likely to produce "good days" and "bad days" and more than four absences per month. (*Id.* at 672)

These findings, consistent with Dr. Grossinger's evaluation of Franks and his review of Franks' prior MRIs and EMGs, (*id.* at 669), caused Dr. Grossinger to opine that Franks could not perform any substantial gainful employment, (*id.* at 817).

At the November 13, 2013 administrative hearing, the VE testified that an individual with the restrictions described above by Dr. Grossinger would be precluded from working. (*Id.* at 946-48)[11] Therefore, the manner in which the ALJ reviewed and considered Dr. Grossinger's opinion is important. If after analyzing Dr. Grossinger's opinion in the manner required by law, the ALJ were to have assigned it controlling weight, then a finding of disability would surely have followed.

The ALJ's conclusion that Franks could perform light work, of course, was directly at odds with Dr. Grossinger's medical opinion. Although Dr. Grossinger had concluded that Franks could not sit, stand or walk for more than two hours every work day, and that he could never stoop, crouch, squat or climb stairs, the ALJ disagreed. Instead, the ALJ determined that Franks had the ability to sit for up to six hours every work day, to stand and walk for between three and five hours in a given work day, and to occasionally stoop, crouch, crawl, squat, kneel, balance or climb stairs. (*Id.* at 24)

After reviewing the entire record, the Court finds that the ALJ's treatment of Dr. Grossinger's opinion amounted to legal error and that the ALJ's findings contradicting Dr. Grossinger's opinion were not supported by substantial evidence. It does so for the following

---

[11]    Specifically, the VE testified that a reduction in productivity of 15 to 20 percent or more, regular absences of even one day a month or more, or breaks that would reduce the work day to less than eight hours would all be factors that would be work preclusive. (Tr. at 947-48)

five reasons.

First, while the ALJ did assess whether Dr. Grossinger's opinion was "consistent[] with the record as a whole[,]" 20 C.F.R. § 404.1527(c)(4), in doing so, the ALJ wrongly concluded that the opinion was "not supported by the treatment record" and was "inconsistent with the medical record[,]" (Tr. at 27). To the contrary, for most of the claimed period of disability, Dr. Grossinger's medical records (along with Dr. Singson's records, discussed above) are the *only* relevant medical records at issue. Certainly, as of the beginning of 2012, the medical record shows only Franks' treatment with Dr. Grossinger (and Dr. Singson), and no physician other than Dr. Grossinger offers a written opinion as to Franks' ability to work in that timeframe. Thus, as to most of the period of claimed disability, in the portions of her decision where the ALJ contends that Dr. Grossinger's opinion conflicts with the "medical record," the ALJ could not have been pointing to other medical opinions that *contradict* Dr. Grossinger's view. Instead, the record indicates that the ALJ was inserting her own "credibility judgments, speculation or lay opinion" *in place* of Dr. Grossinger's medical opinion. *Morales*, 225 F.3d at 317.

For example, one of the reasons the ALJ gave for discounting Dr. Grossinger's opinion was that his conclusions were "inconsistent with the medical record [and showed] only conservative treatment, improvement with injections, and no use of an assistive device." (Tr. at 27) Yet here, it must again be remembered that the period of claimed disability began on April 30, 2011 and extended through to the date of the ALJ's decision (until January 31, 2014). (Tr. at 29 (ALJ decision, dated January 31, 2014, in which the ALJ concludes that Franks had not been under a disability "since April 30, 2011, the date [Franks'] application was filed") (emphasis omitted); *see also id.* at 20); *see Dunson v. Comm'r Soc. Sec.*, 615 F. App'x 65, 67 n.1 (3d Cir.

2015) (noting that in circumstances like these, the relevant end date for the claimed period of disability is the date of the ALJ's decision); *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009) (same). And in reading the ALJ's decision, when one looks for "inconsisten[cies]" between Dr. Grossinger's opinion and the content of other medical records in the claimed period, it is hard to find such examples.

This is in part because in asserting that there were such inconsistencies, the ALJ tended to point to medical records dating from 2011, and tended to ignore the content of Dr. Grossinger's medical records (or any other medical records) dating from 2012 or later. Among the examples of this are the following:

- The ALJ referred to medical records from Dr. Onyewu from October 2011 through December 2011, in order to support the proposition that Franks had a "smooth and coordinated gait[.]" (Tr. at 25-26) But the ALJ did not note that Dr. Grossinger, in September 2013 and October 2013, described Franks' gait as "antalgic" or "severely antalgic"—and not "smooth or coordinated" at all. (Tr. at 818, 820)[12]

- The ALJ cited to Dr. Onyewu's pain management records from late 2011, for the proposition that Franks exhibited "normal muscle strength[.]" (*Id.* at 26 (citing to Exhibit C34F in support)) However, in his October 22, 2013 examination of Franks, Dr. Grossinger wrote that Franks was then experiencing "muscle weakness." (*Id.* at 670; *see also id.* at 816) Indeed, as far back as February 2012, Dr. Grossinger was reporting his findings that Franks had "grade 4/5 weakness of the quadriceps, hip flexors, dorsiflexors and evertors with slightly diminished sensation in the thighs and left lateral legs with absent Achilles reflexes and positive root tension signs to 70°" and "tenderness overlying the lumbar facets." (*Id.* at 835) None of these 2012-2013

---

[12]    Indeed, as was previously noted, even Dr. Onyewu's records from 2011, while describing Franks' gait as "smooth and coordinated[,]" explained that it was also "antalgic[.]" (*See, e.g.*, Tr. at 612, 622, 629)

findings of Dr. Grossinger were cited in the ALJ's decision.

- The ALJ concluded that, at the time of the decision, Franks had demonstrated "improvement with physical therapy" and "improvement with injections[.]" (*Id.* at 27) But the only records that the ALJ cites for this proposition date from mid-to-late 2011. (*Id.* at 25)[13] And Dr. Grossinger's February 2012 notes of his visit with Franks do not make reference to any such "improvement"; to the contrary, they indicate Dr. Grossinger's opinion that Franks was "permanently disabled[.]" (*Id.* at 835) And over a year and a half later, in October 2013, Dr. Grossinger reiterated that same view, noting that Franks then appeared fatigued, had restricted lumbar mobility with kyphoscoliosis, spasm and weakness of the legs, an antalgic, deliberate gait, and positive root tension signs. (*Id.* at 816)

Another reason why the ALJ's assertion that Dr. Grossinger's opinions are inconsistent with the medical record cannot be upheld is seen in those instances where the ALJ identifies "conflicting" evidence that was not actually put forward by any physician. For example, in support of her decision, the ALJ variously notes:

- "Generally, when an individual has suffered pain over an extended period, there will be observable signs such as a significant weight loss, limitation of motion, local morbid changes, or poor coloring or station[,]" but in the instant case "[n]one of the above signs of chronic pain are evidenced." (*Id.* at 26)

---

[13]     In fact, when citing to these "physical therapy" records, the ALJ's decision makes reference to "Exhibits C31F and C33F[.]" (Tr. at 25) These are records from Franks' treatment with Dynamic Physical Therapy, and they date from August 2011 to November 2011. (*Id.* at 551-66, 574-98) While these records show that Franks was reporting some benefit from physical therapy in August and September 2011, (*id.* at 551, 553, 559, 561, 591), the records from October and November 2011 are far less positive, with Franks at times reported to be complaining of severe pain and having difficulty completing therapy, (*id.* at 576, 578, 580, 582, 584, 586, 588). Franks' record from his last appointment with the therapy provider, in mid-November 2011, contains a non-favorable report, with Franks describing how he has difficulty finding a comfortable position and is awakened by pain, and with Franks displaying moderate tenderness in the lumbar area with palpation. (*Id.* at 574)

- Franks' treatment has been "conservative" or has been "conservative in nature [because it] is now limited to injections and medication." (*Id.* at 26-27)[14]

- Franks' "history of drug and tobacco use . . . could reduce the effectiveness of medication and impact healing from surgery[.]" (*Id.* at 26)

These all sound like medical opinions, and for all the Court knows, they might be correct or incorrect opinions. But the point is that there is no instance in the record (at least none the ALJ cited to) of *a physician* actually making these statements, or drawing these conclusions. And so, the Court must assume that the conclusions were not, in fact, generated by a physician, but instead by the ALJ. Such conclusions, unsupported by the medical record, surely cannot be used to contradict the opinion of Franks' own treating physician. *Cf. Morales*, 225 F.3d at 318-19 ("Certainly, no doctor in the record made any statement which support the ALJ's speculation . . . . Because [a treating doctor's] conclusions . . . were not discredited based on objective medical evidence, they should have been fully considered in assessing [plaintiff's] ability to perform his past work."); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 125 (3d Cir. 2000) ("In this case, there is absolutely no evidence, medical or otherwise, that a 5 foot tall, 100 pound woman would be able to lift a 50 pound box. In making this conclusion, the ALJ went beyond the uncontradicted evidence in the case and committed error."); *Griffies v. Astrue*, 855 F. Supp. 2d 257, 278 (D. Del. 2012) (finding that ALJ's conclusion that the plaintiff's "divorce was a root cause of [plaintiff's] depression" was not based on substantial evidence

---

[14]    In the relevant period, Franks underwent multiple nerve blocks, epidural injections, an ablation, and was given numerous prescriptions for pain medications. (*See, e.g.*, Tr. at 324, 407, 465, 605, 624-25, 652-55, 667-68, 818, 820, 825-33, 835, 854). All of this may, in fact, amount to "conservative" treatment, but no physician has ever said so on the record.

because it was "not present in [the treating doctor's] opinion" and was otherwise "not supported by any objective medical evidence in the record.").

In sum, for most of the claimed period of disability (certainly from at least February 2012 when Dr. Grossinger's treatment of Franks began, through to the date of the ALJ's decision in January 2014), there are not *any* medical records that are *inconsistent* with Dr. Grossinger's diagnoses. This is in part because no State agency physician (or any other physician who provided an opinion that was said to contradict Dr. Grossinger's diagnosis) actually examined Franks or produced any medical records during that time frame. Dr. Borek—the only physician to opine (without having examined Franks) in the claimed period of disability that Franks was not disabled—offered his opinion back in October 2011. (*Id.* at 573) It would be hard for Dr. Borek's opinion to necessarily contradict Dr. Grossinger's opinion as to Franks' inability to work from early 2012 through late 2013, as it was offered months before Franks became Dr. Grossinger's patient, and years before the end of the claimed period of disability. *See Soto-Cedeño v. Astrue*, 380 F. App'x 1, 2 (1st Cir. 2010) (finding that differing evaluations of plaintiff's condition as of different time periods could not "reasonably be characterized as 'inconsistent'" with one another); *Kroh v. Colvin*, Civil Action No. 3:13-CV-01533, 2014 WL 4384675, at *22 (M.D. Pa. Sept. 4, 2014) (noting that an "RFC form prepared by a non-examining state agency medical consultant cannot constitute substantial evidence when it is not based upon the full medical record before the ALJ at the time of hearing and decision, particularly where the evidence suggests a deterioration in the claimant's condition[,]" in a case where the non-examining physician's RFC was provided in December 2010, where the ALJ's decision, which relied heavily on that RFC, came in January 2012, and where in the interval, the

records of various treating physicians indicated a worsening in the claimant's mental health); *see also McCoy v. Colvin*, Civil No. 3:15-CV-00629, 2016 WL 3031826, at \*6 (M.D. Pa. May 20, 2016) (concluding similarly to *Kroh*).

Second, on some key issues, the ALJ's decision appears to rely heavily on statements that appear inaccurate (or at least as to which the Court can find no support in the record).

For example, the ALJ concludes that Dr. Borek found Franks "capable to perform work at a light level of exertion[,]" and that this finding supports the ALJ's decision that Franks can perform light work. But Dr. Borek did not come to any such conclusion. Indeed, no physician of record has ever concluded that Franks can perform light work. To the contrary, although some of Dr. Borek's individual assessments of certain of Franks' abilities are consistent with someone who could do light work, when it came time for Dr. Borek's ultimate conclusion, he determined only that Franks' "*max[imum]* [RFC] is for sed[entary] work[.]" (Tr. at 573) And indeed, even in concluding *that*, Dr. Borek used language that suggested that it was not out of the realm of possibility that Franks may be capable of less than sedentary work—writing that Franks' "alleged inability to perform even sed[entary] activity is partially credible, given" Franks' obesity and the impact and hazards created by the pain prescriptions that Franks was taking. (*Id.* at 573)[15]

Moreover, a key factor in the ALJ's decision of non-disability was that "[r]adiology studies performed in July 2012 showed only very mild lumbar degenerative changes[.]" (*Id.* at 27; *see also id.* at 26 ("Notably, x-rays taken on July 10, 2012 showed very mild degenerative

---

[15]      Of course, Dr. Borek's opinion that Franks could perform no more than sedentary work *could* still support a decision that Franks was not disabled—were it not for the unrebutted opinion of Franks' treating physician, Dr. Grossinger, that from the period from *February 2012 through the hearing date* Franks was disabled. Dr. Borek's opinion does not conflict with that conclusion.

changes at L3-4[.]")) Yet the Court can find no reference to such July 2012 radiology studies in the record. The ALJ cited to "Exhibit C44F" in support of this statement, but that exhibit appears to be detailing hand-written medical records dating from August and September 2013—not July 2012. (Tr. at 836-38)

These inconsistencies further undermine the ALJ's ultimate conclusion here, one that was in conflict with that of the treating physician.

Third, the Court agrees with Franks that diagnostic testing "supports the opinions of Dr. Grossinger regarding [] Franks's pain levels and inability to stand and/or walk for prolonged periods of time." (D.I. 14 at 22) Franks argues, and the Court agrees, that the ALJ "minimized the findings of" certain tests in her decision, (*id.* (citing Tr. at 26)), and that she "failed to properly consider how these tests corroborate the back complaints of Mr. Franks[,]" (*id.*).

More specifically, the ALJ's decision refers to the results of certain tests ordered for Franks, including a November 2011 CT scan (that the ALJ described as showing that Franks had "an annular tear at L3-4") and a March 2012 EMG (that, according to the ALJ, "appears to show evidence of right S1 radiculopathy"). (Tr. at 26) Yet the ALJ's descriptions of these test results downplay their severity a bit. The November 2011 CT and related medical records, for example, showed not just an "annular tear at L3-4[,]" but a "grade 4 tear[.]" (*Id.* at 605, 616) At that time, Frank's discogram was described as an "ABNORMAL" study, and Franks was described as having "10/10 low back pain." (*Id.*) The results of the March 2012 EMG were that it was an "abnormal study" showing "moderate right S1 radiculopathy." (Tr. at 673 (emphasis added))[16]

---

[16]     Both of these tests were conducted after Dr. Borek rendered his opinion in October 2011 as to Franks' ability to work.

38

Fourth, the Court again agrees with Franks that, when the ALJ found that Franks was "independent in activities of daily living[,]" (Tr. at 27), she did not properly consider Franks' own written and hearing testimony. The ALJ's conclusion here appears to have been based on a finding, set out earlier in her decision, that Franks' "reported activities of daily living, including his ability to use stairs in his home, perform household chores, cook, and attend church" were consistent with the conclusion that Franks could do light work. (*Id.*) Yet in Franks' July 6, 2011 Function Report, he advised that he could walk no more than half a block, was unable to perform chores due to his pain, needed help with dressing and personal care, and slept poorly due to back pain. (*Id.* at 201-05) And at the November 2013 administrative hearing, Franks testified, *inter alia*, that: (1) it was difficult for him to take the bus, as his legs tend to get numb and his back hurts when he rides; (2) he did chores like "light cooking . . . [and] dusting" at home but had to "lay down when [his] back and legs bother[]" him when performing such chores; and (3) he rests on the couch while his son and daughter, who help him around the home, visit him. (*Id.* at 932-34)[17] It is difficult to find anything that Franks said during the administrative hearing that *contradicts* Dr. Grossinger's finding that Franks could not reasonably labor in any capacity. Thus, in assessing how Franks' ability to perform daily activities bears on his claim, it was error for the ALJ to substitute her own medical judgment over that of Franks' treating physicians. *See Kent*, 710 F.2d at 115 (reversing ALJ's decision when "shorn of its rhetoric, the ALJ's conclusion that appellant [was] capable of engaging in sedentary activity [was] merely a function

---

[17]      Franks did say at the hearing that his home had stairs, that he went to the store with his friend "at times" and that he went to church every other week. (Tr. at 933-34) But Franks said nothing more about his ability to navigate stairs, or about the nature of his activity while at the store or while at church.

of the ALJ's own medical judgment.").

And fifth, the applicable regulations required that the ALJ consider the length of Dr. Grossinger's treatment relationship with Franks, the frequency of his examinations, the nature and extent of that treatment relationship, and the degree to which Dr. Grossinger's opinion relates to an area in which he specializes. *See* 20 C.F.R. § 404.1527(c). Here there is no indication that the ALJ actually took these factors into account. Dr. Grossinger is a neurologist with a subspecialty in pain medicine who treated Franks for nearly two years, longer than any other pain management provider. (Tr. at 817, 834; *see also* D.I. 14 at 22) During the history of their treatment relationship, Dr. Grossinger saw Franks on at least 10 occasions between February 2012 through October 2013. Yet the ALJ did not explicitly consider or give any credence to these factors. Were the factors to have been truly considered, they would surely also have augured in favor of fully crediting Dr. Grossinger's unrebutted opinion that, from at least February 2012 through the hearing date, Franks could not work. *See Tucker v. Colvin*, 117 F. Supp. 3d 594, 611 (D. Del. 2015) (listing the ALJ's failure to consider the length of the treatment relationship between the claimant and his treating physicians, and the level of knowledge the treating physicians had about the claimant's impairments, as factors supporting a finding that the ALJ had erred in giving the treating physicians' opinions "little weight"); *see also Morales*, 225 F.3d at 317.

Taken together, these five reasons demonstrate that Dr. Grossinger's opinion was not in conflict with the relevant medical record, and that the ALJ's decision to the contrary relied upon facts that were either outdated, were inconsistent with the actual record, or appear to be inaccurate. Therefore, the ALJ's decision to give Dr. Grossinger's opinion "little weight"

amounted to legal error and/or was unsupported by substantial evidence. *See Saragino v. Colvin*, Civil Action No. 12-138-LPS-CJB, 2015 WL 5768935, at \*23-25 (D. Del. Sept. 30, 2015) (finding that ALJ's decision to afford "little weight" to a treating physician's opinion that plaintiff was in constant, severe pain was error—despite "minimal" clinical findings—where the plaintiff's complaints were "consistent throughout the entire record and [were] consistent with [plaintiff's] diagnoses."); *Ludlam v. Colvin*, Civil Action No. 14-988-RGA/MPT, 2015 WL 4966371, at \*12-13 (D. Del. Aug. 20, 2015) (ALJ's decision to afford "little weight" to a treating physician's opinion that plaintiff could not perform sedentary work was error—despite findings of normal muscle strength—where the physician, a pain management specialist, relied on objective testing in reaching his conclusions and repeatedly documented plaintiff's intense pain and his treatments thereof).

### 4. Existence of a Significant Number of Jobs in the National Economy that Franks Could Perform

Lastly, Franks argues that the Commissioner failed to sustain her burden of establishing that there was other work in the national economy that Franks could perform. (D.I. 14 at 24-25) Specifically, he asserts that the ALJ's reliance on the VE's response to a hypothetical question was improper because "the hypothetical question upon which the ALJ relied . . . was deficient as a matter of law. . . . [because it] did not comprehensively describe Mr. Franks's limitations." (D.I. 14 at 24)

Vocational testimony in disability determination proceedings often centers (as it did here) on such a hypothetical question—one relating to whether the applicant could perform certain types of jobs, and the extent to which such jobs are found in the local and national markets.

41

*Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id.* In posing a hypothetical question to a vocational expert, an ALJ "is not required to submit to the vocational expert every impairment alleged by the claimant[,]" but rather need only include those "impairments which have been found to exist on the basis of credible evidence." *Krolick v. Astrue*, Civ. No. 06-139-LPS, 2008 WL 3853401, at *10 (D. Del. Aug. 18, 2008).

As was noted above, at the end of the administrative hearing, the ALJ asked Beatty-Cody several questions regarding whether a hypothetical person afflicted with certain physical limitations could perform certain types of jobs. The limitations described in the first of those hypotheticals mirrored the ALJ's ultimate RFC determination. (*Compare* Tr. 28, *with id.* at 943-44) In answering that question, Beatty-Cody stated that such a person could perform the jobs of assembler, inspector, and hand bander. (*Id.* at 944-45) Because the ALJ found that the limitations contained in the hypothetical question matched Franks' actual limitations during the claimed period of disability, the ALJ therefore found that Franks could have performed any of these three "light work" jobs, and was thus not disabled. (*Id.* at 28)

Franks argues that the hypothetical question posed by the ALJ to the VE did not accurately portray Franks' physical limitations because, *inter alia*, it failed to properly incorporate Dr. Grossinger's opinion. (D.I. 14 at 24-25) This attack on the hypothetical question is, as the Commissioner argues, "better understood as a challenge on the ALJ's residual functional capacity assessment." (D.I. 21 at 10 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554

n.8 (3d Cir. 2005))

As was discussed above, the Court agrees with Franks that the ALJ committed reversible error in affording "little weight" to Dr. Grossinger's opinion. The VE's testimony as to the fourth hypothetical question indicated that an individual in Franks' condition, as assessed by Dr. Grossinger, would be precluded from working in the national economy. *(See* Tr. at 946-48; D.I. 14 at 25) Therefore, the ALJ erred in formulating the hypothetical question at issue (and, relatedly, in determining Franks' RFC). That error, in turn, led to an erroneous decision that there were three light work jobs in the national economy that Franks could perform.

### 5. Appropriate Remedy

Under Third Circuit precedent, where "the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits[,]" there is no need to remand a case for further administrative proceedings, and instead, a Court may direct that benefits be awarded. *Morales*, 225 F.3d at 320 (internal quotation marks and citation omitted). Although remand is often warranted in cases where the evidence is not one-sided, and where various treating and non-treating physicians came to different conclusions on the question of disability, *Morris v. Astrue*, Civ. Action No. 10-414-LPS-CJB, 2012 WL 769479, at *25 (D. Del. Mar. 9, 2012), that is not the case here. As the Court has noted above, in the nearly two-year period from February 2012 up to the date of the administrative hearing, Franks' treating physician repeatedly opined that Franks could not perform substantial gainful employment. That opinion was supported by medical evidence and other evidence of record. And there is no medical opinion issued in that time frame offering a contrary conclusion, or support therefor.

43

Thus, the Court does not see how, on remand, the ALJ could reach any other conclusion but that Franks was disabled during the relevant period. For that reason, remand would serve no purpose, and the Court will direct that benefits be awarded. *Cf. Sampson v. Astrue*, Civ. No. 09-4372(DRD), 2011 WL 1205281, at \*14 (D.N.J. Mar. 28, 2011); *Kirk v. Astrue*, 723 F. Supp. 2d 693, 699-700 (D. Del. 2010); *Nance v. Barnhart*, 194 F. Supp. 2d 302, 322 (D. Del. 2002).

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, Franks' motion for summary judgment is GRANTED and the Commissioner's cross-motion for summary judgment is DENIED. The final decision of the Commissioner dated January 31, 2014 is REVERSED and the Commissioner is DIRECTED to award benefits to Plaintiff. An appropriate Order will issue.